All right, please proceed. Thank you, Your Honor. My name is Tim Bechtel, representing the Alliance for the Wild Rockies in this case. Grizzly bears are pretty amazing, ferocious animals, but when it comes to contacts with humans, grizzly bears generally lose, and that's really what this case is about. The population of grizzly bears in the Kabanayak has been under federal management for about four years, and during that time the population in the Kabanayak has not recovered, and in fact has declined. And so, you know, the Forest Service manages about 90% of the habitat in the Kabanayak, so this isn't an issue of trying to deal with private land in holdings or things like that. The issue is that whenever there's a road, it allows humans to access an area where grizzly bears are, and where humans and bears interact, bears get shot, they get run over, and they die. So the question then is, if there's some institutionalized caution where the Forest Service has to prioritize the mission of the preserving grizzly bears over the mission of the Forest Service, then it seems to me that the preservation of the endangered species, that institutionalized caution, has to give them the benefit of the doubt. And so the population of the grizzly bears essentially lies in the hands, the fate of the population lies in the hands of the Forest Service. And if they continue to log and to road, then the impacts to the grizzly bear is going to be, continue as it is. Mr. Bechtel, may I separate for a second your claims for the grizzly bears for NEPA, National Environmental Protection Act claims, and the Endangered Species Act claim. On the Endangered Species Act claim, you lost below the district court. That's right. And the district court granted summary judgment to the government. Then you appealed that. And then you dismissed the appeal. And then, more than a year afterwards, you sought reconsideration, which the court found to be untimely. What was wrong with the district court's finding as to your ESA claim being untimely? Well, the issue there was we won on most issues below, and then the government appealed. So we cross-appealed. However, because the government then withdrew its appeal, and the issue was remanded to the Forest Service. But your issue was different from the issues that the government initially lost on and withdrew their appeal. Right. Your analysis or your claim in relation to the ESA is different in analysis from the NEPA claim. Correct? It is different in analysis. But the issue there, of course, is that we had won all relief that we could win. Therefore, because the case had been remanded to the Forest Service, there's nothing more we could get. And, therefore, this – Whether you win again or NEPA, but that doesn't mean that you couldn't get more under ESA. At the time, the court had relied – was relying on two cases before, the Elsia Valley case and the Happner v. Tidwell case. So in Happner v. Tidwell, what happened there was we had similarly won on some issues, lost on others, appealed, and then had prevailed on appeal. It was remanded then to the Forest Service. The Forest Service did some changes. And for those issues that we never got a chance to get adjudicated on appeal, we brought them back to the district court. And the district court said, well, no, you don't file a new case. What you should do is I'll keep jurisdiction, and we'll just bring those cases that you lost on before, and then you can bring them up to the appeals court then. So that was the sort of the strategy that the district court asked us to follow. And so that's the strategy we followed in this case. So in this case, we won on some issues below and then on the appeal because our appeal necessarily had to be dismissed because we could get no further relief. You mean the relief that you got under ESA or the relief that you got under NEPA was exactly the same as the relief you asked for under ESA? Yeah, an injunction in remand. An injunction of the project in remand? That's right. Okay. And so the issue here is do you have jurisdiction now to look at our ESA claim that was originally challenged to the biological assessment from the 2009 Forest Service action? So in that regard, what has changed in the interval? We know what the district judge ruled in 2010 with his order. So what is it that you want to happen now? Well, what we want to have happen now is for this court to find that the Forest Service, under the facts before it from that BA, has to find that there was an adverse effect to grizzly bears because had the Forest Service found that there was an adverse effect to grizzly bears, that would have required formal consultation under 50 CFR 40214 instead of the informal consultation. So the issue on adverse effect is this. We believe that the ESA handbook requires that if there is going to be some adverse effects, then the proposed action has to be found likely to adversely affect. And we cite the record at 343-344 where the ESA handbook tells the Forest Service how to handle it. So if the appropriate finding in a biologic assessment, if there's any adverse effect to illicit species that may occur as a direct or indirect result of the proposed action and the effect is not discomfortable, insignificant, or beneficial, then you have to find there is an adverse effect ruling. Let me ask you, I want to maybe back up a little. I want to make sure I understand your argument because I think you argued in your briefs because the agencies are arguing that this ESA claim should be moot because there's been other record or evidence or record has changed now because they've revised so much of their plan. I think you responded well, but the biological assessment hasn't changed since 2009. Is that what you said? That's correct. The Forest Service relied on the exact same biological assessment for the reissuance of the ROD as they had in the original ROD. Okay. And so you were saying because of that you should be allowed to, you know, argue or assert that ESA claim again in this current case. Is that correct? That's correct. All right. My question for you is even though the Forest Service hasn't produced a superseding biological assessment since this 2009 one that they submitted, hasn't the Forest Service developed an intervening administrative record to support that it's not likely to adversely affect the finding? You're saying now that it should. Is that right? I want to understand why you think that it does. Yeah, so our position is that the Forest Service has maintained both prior and subsequent to the first and second ROD that there's not going to be any adverse effects, right? There's not likely to adversely affect. We believe that under the definition of not likely to adversely affect, the Forest Service must find that there is adverse effect because there's three aspects to it. First, is it discountable, which means extremely unlikely to occur? Well, no. Here this Forest Service action is going to happen. They're going to build some roads. They're going to log some trees. So that part doesn't apply. Is it insignificant? It's like, no, it's not insignificant because based on the best judgment, a person would not be able to meaningfully measure, detect, or evaluate insignificant effects. Well, here they can obviously measure and evaluate the effects because they know exactly, you know, they're talking about how much percentage of road and how much percentage of core, so they can measure that. Should we be redoing this review, though, in this first instance, the one, you know, since there's new record evidence? Should you be doing the review? Or should we send it back to Judge Molloy? I think it's up to you. You can send it back to Judge Molloy and say, Judge Molloy, we believe that you should consider these effects again. Or in the alternative, you can make that decision yourself because it's de novo.  The grizzly bear recovery plan states quite clearly that roads and logging are competitive uses with grizzly bears. So because roads are acknowledged adverse effect and not likely to adversely affect, finding has to be impossible. And if it's impossible, it's certainly arbitrary and capricious. So the Forest Service argues in their briefs that these effects are discountable and impacts are extremely unlikely. But what the ESA handbook says that if the overall effect is beneficial and the Forest Service says the overall effect here is going to be beneficial, but it's also likely to cause some adverse effects, then the proposed action has to be likely to adversely affect. If it's going to affect one bear adversely and the Forest Service admits that it will, it will displace and temporarily cause bears to not use these areas, then it has to be a finding likely to adversely affect. In your briefs, you made a big point of arguing about the Waukenian study. And it just seems like the district court determined that the Waukenian study constitutes the best available science, and so I'm just curious under what authority you think we should be able to review that finding. His finding that the Waukenian study is the best available science. Well, I think what that requires you to look at is whether or not that that study included everything that it could have. In other words, so the Waukenian study is now 10 years old, and there's nothing subsequent to it that would indicate that that study of six bears, two of which got killed immediately after the study, and did not account for population pressure from other bears adjacent to it. I think that's the most significant factor. And so what Judge Noydlood, as he looked at all the factors, he looked at the things that said, well, there's some biologists that think this is not a good study, some biologists that say we should have done something else, but at the end of the day, I think this is probably good enough. I want to ask you a question regarding the Grizzly Project, because you claim it doesn't comply with the Kootenai Forest Plans directive that the Forest Service prioritized the grizzlies' needs over competing land uses. And I want to just ask you, what's your strongest evidence that the agency's failure is failing to prioritize the grizzlies' needs? Well, that's quite easy, Your Honor. The population is going extinct. I'm sorry? The population is going extinct. I mean, they failed to meet all the recovery targets in the recovery plan. You know, they're supposed to have zero mortality. They have mortality. They're supposed to get 100 bears. They have 41, you know, at their best guess. So, Your Honor, the number of bears is not increasing. The likelihood that the population is decreasing is 73%, according to the latest study. So if those are the targets of whether or not the needs of the bear when they compete are being met, then that's quite obvious that the bear is losing. If I would, I'd like to retain the rest of my time for rebuttal. Thank you. May it please the Court, good morning. My name is John Smeltzer for the Forest Service and the Fish and Wildlife Service. Your Honors, the grizzly bear population in the Cabinet Yak ecosystem remains in peril, but the recovery of that population is a long-term venture. The Grizzly Project is a series of timber and road management actions that are designed to help facilitate the long-term recovery of the bear by improving forest health and improving habitat security within the relevant bear management units. In order to accomplish those actions, there need to be temporary impacts to grizzly bear habitat, but the Forest Service reasonably evaluated all of those impacts under NEPA. The Forest Service complied with all management directions in the forest plan with respect to actions in grizzly bear habitat, and the Forest Service reasonably determined in consultation with the Fish and Wildlife Service that the temporary impacts to habitat are not likely to adversely impact the grizzly bear. For all of those reasons, we ask this Court to affirm the District Court's judgment. And for one additional reason, which was discussed in the opening argument regarding the jurisdiction over the ESA claim, we submit that this Court does not have jurisdiction over the issue being raised under the Endangered Species Act because the relevant decision was never brought before the District Court and is therefore not before this Court, and because the Alliance never sent a 60-day notice letter to the agency to obtain jurisdiction to challenge that decision. And the key here is... Well, the biological assessment hasn't been superseded, and I know that that's not insignificant. So what's your response to that? The biological assessment is a document that doesn't have independent legal significance. What the Endangered Species Act says is that an agency shall not take action that will lead to possible jeopardy to a species, and that's what you're trying to deal with in Section 7 consultation. So the agency took initial action based on that biological assessment. It was challenged, and it was set aside. So it went back to the agency for the agency to reconsider. There was a new public review and a new consultation where the Forest Service again brought... There was new information. They went back to the Fish and Wildlife Service. There was a further consultation. There was a further concurrence letter, and then there was a decision again to proceed. They didn't revise the biological assessment, but the biological assessment isn't by itself an action to do anything. But there's also now new evidence or updated administrative record. Assuming we reach the CSA claim, should we consider the new evidence reflected in the updated administrative record? Well, that's kind of the conundrum. If you did consider the claim, you would have to, because the only relevant decision before the court in terms of agency decision is the 2012 record of decision based on the 2011 concurrence letter, which is cited by the alliance at page 10 of the reply brief where they say, look, you got the handbook analysis wrong. They're challenging a concurrence letter that came two years after the biological assessment that they're now saying is the relevant issue before the court. In light of what Mr. Bechtold said, what more could they have done to preserve the CSA claim? They needed to either bring a separate... Well, first they had to file a 60-day letter based on the new decision to proceed, but then they needed to ask the district court either to hear a new, file a new complaint or ask this judge to reopen the case, amend their complaint, and bring the ESA claim forward. But when that happened a time before this same judge in that Happner v. Tidwell, a case that was in the same posture as this one, the court, the district court held, had not introduced new evidence in support of its renewed claims. The court would not consider the renewed claims. So it just seems, you know, unfair. You know, if they do that, then they're precluded for this reason, and if they don't do it, they're precluded for another reason. But as a matter of procedure, what happened in Happner was what was supposed to happen. There was a new complaint filed. The district court ultimately consolidated that complaint with the initial complaint, and then the case went forward. And then on appeal, this court acknowledged that, you know, the cases were consolidated, so we have jurisdiction over all of the issues, which, because on the second complaint, they raised essentially the same issues in the first. To the extent that the court in Happner, the district court, suggested that the court would retain jurisdiction somehow on issues that were not brought back, on claims that were not brought back to the court, this court is simply wrong. But the issues that were raised in Happner are not clear from the Court of Appeals decision, and this is a different case. It involves an ESA claim based on a new decision and a new consultation that happened. And what Alliance is asking this court to do is to review a concurrence letter, again, August 2011, that explains the Fish and Wildlife Service's rationale for why this doesn't adversely impact the grizzly bear. And that claim was never brought to the district court, challenging that concurrence letter and that analysis. There was never a 60-day letter filed. And it's impossible for this court to review the agency's decision-making, because the relevant decision by the Forest Service is after that consultation, and the Forest Service is certainly allowed to rely on that consultation. And so if this court is going to review it, somehow the court has to construe all of this as having been a new complaint. But it really wasn't. Let me ask you, in Swanview-Cole versus, I think it's Barboletos, this court considered the same Kootenai Forest Plan and remanded for the Forest Service at that time to establish and apply a standard for evaluating when land use values compete with grizzly bears' needs within the meaning of the Forest Plan. And so I guess my question for you, has the Forest Plan followed the direction and developed those standards? And how can the grizzly project comply with the Forest Plan absent clear standards? The answer to the first question is no, the Forest Service has not gone back generally to create new plans and standards. With respect to that case, quite frankly, I'm not sure what happened on remand as to whether the Forest Service articulated sufficient grounds there to move forward with that particular project. But let me put it in the proper context. This is now we're talking about the National Forest Management Act claim and the claim that we're not being consistent with the Forest Plan. The Forest Plan has, as you alluded to, the management direction that if there's competing uses, the Forest Service is to favor the needs of the grizzly bear and is to make any project that affects the grizzly bear compatible with grizzly bear needs. They have that as the general direction upon recommendation of the Interagency Grizzly Bear Committee. Then in the same Forest Plan they have a series of more concrete management directives in order to implement that. And included in those more concrete management directions are standards about how to mitigate impacts, but standards that specifically say timber management that improves habitat conditions for the bear can be undertaken. So there's no prohibition on timber management. What the plan says in order to make these projects compatible you need to do certain things. And here what the Forest Service did was explain that we have complied with the no compete or the standards about competition and compatibility by meeting all of these individual parameters that show that we are complying with the specific directives of the plan. What you had in Swanview was the opposite. There you had the same no compete general standard and you also had standards and guidelines that were designed to meet the no compete standard. But the proposed project there was for a site specific amendment to those standards and guidelines to relax standards and guidelines. And there was no explanation in the record about why that would meet the no compete or the favoring the grizzly bear direction. Because what the Forest Service there said, we're going to relax our standards to allow this recreational use and it's not a problem. And so the district court in that case said, well we're going to say that the Forest Service met the plan standards and the district court invented a standard that says, well there's no serious negative consequence. And what this court did was to take a look at that and say, well that no serious negative consequence, that's not in the forest plan. And you've clearly relaxed your standards and you haven't explained how relaxing the standards is going to meet this general idea that you've got to be compatible with grizzly bear needs. Here, complete opposite. Again, we met the standards that are specifically designed to ensure that the project is compatible with grizzly bear needs and there's no dispute over that. There is a dispute as to whether those standards are sufficient, but that goes into the walk-in and study and the other things that we've talked about. I asked Mr. Bechtold the reverse of this question. Let me ask you, what's your strongest evidence that the agency has prioritized or successfully prioritized the grizzly needs, especially in light of the fact that the bear population continues to go down? Because the grizzly recovery plan specifically said that the Forest Service needed to go out and provide or to formulate habitat security standards. Those are the standards with respect to open motorized road density, total motorized road density and core habitat. The recovery standard says you need to do that for each bear management unit. And then when you take projects within the bear management units, you need to comply with those standards. What the Forest Service is doing in this case is a series of actions to improve forest health and to bring the habitat in these bear management units up to compliance with those standards. It's improving conditions with respect to those metrics. That's why it's compatible. The forest plan and the recovery plan said to do things that will help, and that's what the Forest Service is attempting to do. Again, there are some temporary impacts, potential adverse impacts in terms of displacement. But those impacts are permitted under the forest plan in order to meet these other objectives. For example, one of the aspects of this project is road decommissioning. In terms of grizzly bear core habitat, the most action that's going to occur under all the series of actions that have been approved under this project within grizzly bear core habitat is road decommissioning. That's what Alliance wants. They don't want roads in there so people can go in. You can't decommission a road within core habitat unless you go in and temporarily potentially have some impacts that will displace bears. That's what we're talking about. These are actions that are designed to improve the habitat in these areas. Why can't you just decommission a road by putting a barrier up? You can do that. Part of the problem with that is you can get around barriers and you can walk on roads, but also these roads have issues with respect to sedimentation and environmental impacts if they're left in the conditions that they're in. So the Forest Service makes a scientific judgment. In certain cases they will decommission roads passively by abandonment, but in other circumstances they will determine that it's necessary to actively decommission roads because the culverts and the infrastructure on those roads are causing environmental harm. And what they need to do in order to essentially obliterate that harm, those roads, and make them improve the forest conditions and good for the bear and general forest conditions is to do some things with respect to culverts in the roads so they can recover and become natural wild parts of the landscape again. Is there some ongoing evaluation if there is unforeseen or I'll just say unforeseen short-term negative impact on grizzlies that was not adequately accounted for? The agencies are under a general obligation under these statutes if new information comes up with respect to impacts, like under NEPA to do supplemental analysis and under the ESR. As opposed to if information comes up, because we get cases where in the wilderness, you know, it takes the interest groups to go out and find the information and bring it to the attention is Forest Service making sure that these decommissioning projects, for example, aren't having more of a negative impact than would be tolerable? Well, some of the projects are done directly by the Forest Service. Some are being done in terms of the commercial timber sale aspects of the projects would be done by the contractor. Right. The Forest Service has, you know, systems in place to monitor to ensure the contractors do their. That's the answer to my question. Yes, they are monitoring. Right? Yes. Okay. All right. I guess the one last point I just want to get to is the question about the Section 7 handbook and the notion that was raised in the reply brief. This is, again, if the ESA merits are before the court, and the notion that the agency has somehow misinterpreted the handbook, and we submit that's simply not the case. The issue isn't whether the action is going to occur or whether the action can be measured in terms of road or in terms of, you know, timber cut. The issue is whether there's going to be a significant impact on individual bears or the species that can be detected or measured. And what the Forest Service did in the part that's quoted in the reply brief was to refer to the standards for take in Section 9, which are cited in the Forest Service handbook. The Forest Service handbook says that it's insignificant. To be insignificant, it should not arise to the level of take. And so it cross-references what it is to take. And then within take, two components of take are to harm or to harass, and each one of those components refers to this notion of injury. When they're referring to injury there, they're not talking about physical injury. They're talking about injury such that there's a significant disruption in a behavioral pattern of a bear with respect to where the bear would normally eat, normally den, significant changes to the landscape that are going to affect the bear's normal behavior. Simply displacing the bear from an area where an activity is occurring is not necessarily a significant adverse effect, because all that means is the bear's going to avoid the area while there's project activity going on. And what the Forest Service did, and the Fish and Wildlife Service did, was to review the record and to ensure that there was sufficient core habitat, displacement habitat, for the bear to use such that the impacts, and most of the impacts are in already eroded areas and not in core areas, but such that when the bears avoid, you know, those areas that may be impacted during the temporary period that they're cutting, that there will be sufficient habitat for all of the bear's needs. And that's how they came to that determination. Time's up. Thank you, Mr. Klauser. Thank you. First of all, no 60-day notice is required to challenge the Fish and Wildlife Service concurrence. That's an APA claim. So everything the Fish and Wildlife Service did here doesn't require any 60-day notice under the ESA. That's a simple, straightforward APA claim, and it's before the court properly now. The Forest Service is making an argument basically that heads I win, tails you lose, on whether we can bring analysis to the BA before you. Heads, I mean, we're just simply following the instructions of Judge Malloy in the path we followed. In a similar case 10 years ago, the Forest Service argued res judicata when I brought up the same thing that I brought up before and lost. So how can I win? If they're going to say, well, you should have brought this up before. In fact, you did bring this up before. This was in the progeny to the Rittenhouse case. It was referenced in the case here regarding a timber sale in the Gallatin National Forest. And so in that case, the Forest Service argued res judicata. So if we brought the BA here now and filed another case and said they would argue res judicata, you should have brought this up, or you did bring this up before, you can't bring it up again, where are we? I think that Judge Malloy had a procedure that he outlined for us to follow, and we followed it, and here we are. Regarding temporary impacts, there's no dispute that the project has temporary impacts. And if there are temporary impacts, then I think the Forest Service needs to admit that and follow the definition of it likely to adversely affect and just say, look, this is likely to adversely affect, and let's have a formal evaluation with the Fish and Wildlife Service and get on with it. But that's what we need them to admit, that logging and roading is an adverse effect. That's what we'd like the court to tell the Forest Service to do is say, look, if you have logging and roading, just admit it. It's an adverse effect. Get on with it. Now, the deal with the roads, there is no guarantee that the roads here are going to be decommissioned. There's no guaranteed funding for it. As we said in our brief, the Wildlife Federation v. NIMFS case, you know, if there's no clear proof that that's going to happen, you can't really rely on it to cure the problems that are going to this project's going to happen. There's nothing that we can do after the project is implemented to come back and say, but you didn't do this right. We don't have standing to bring that. So the only time we can bring this case before the court is before they do it. And if they say, if we go back and say, but you didn't do this other project right, we have no standing to challenge that because it's all done with. Now, regarding the effect of using habitat as a proxy for impacts to the species itself, this is basically the way you measure impacts to a species short of looking at a dead bear in the road. So in both the Rittenhouse case and the Idaho Sporting Congress case, the court said, look, habitat is the proxy you look at to determine the impact on the species. So you can't say just because we think this isn't going to have an effect on a bear, doesn't mean it's not going to have an effect on the habitat, because you can measure the impact on the habitat. It's very tough to measure the impact on an individual bear, except if you see it run away or except you see it dead. And that's why the Forest Service uses impacts to habitat as a proxy for their analysis on whether it's going to have adverse effects. And regarding the recovery standards and whether or not there's compatible and competing uses, what this court required in Swan View v. Barbalatos was for the Forest Service to make some objective standard that you can measure their actions by. And that's all we want is to allow someone to make some objective inquiry and say, yes, this is compatible, and yes, this is a competition, or no, it's not. Without that objective standard, there's no way anyone, me or you, can measure that. Thank you. I appreciate it. Thank you very much. The case of Alliance for the Wild Rockies v. Bradford is submitted, and we'll go to the last case on the calendar, which is Cascadia Wildlands v. BIA.
judges: Fisher, Bea, Murguia